```
                    UNITED STATES DISTRICT COURT
                       DISTRICT OF NEW JERSEY
```

FRANCES L. SEIDLE,              :    HONORABLE JOSEPH E. IRENAS
                                :
     Plaintiff,                 :    Civil Action No. 05-5381 (JEI)
                                :
     v.                         :
                                :              **OPINION**
JO ANNE B. BARNHART,            :
Commissioner of Social          :
Security,                       :
                                :
     Defendant.                 :
                                :

**APPEARANCES:**

WOLF & BROWN L.L.C.
By: Michael J. Brown, Esq.
228 Kings Highway East
Haddonfield, NJ 08033
     Counsel for Plaintiff.

CHRISTOPHER CHRISTIE, UNITED STATES ATTORNEY
BY: Maria Pia Fragassi-Santangelo, Esq.
Special Assistant U.S. Attorney
Social Security Administration
Office of the General Counsel
26 Federal Plaza, Room 3904
New York, NY 10278-0004
     Counsel for Defendant.

**Irenas**, Senior District Judge:

   Frances Seidle ("Seidle") brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), and Section 1634(c)(3) of the Act, 42 U.S.C. § 1383(c)(3), for review of the final determination of the Commissioner of Social Security (the "Commissioner"), denying Seidle's application for Social Security Disability Insurance

Benefits.  For the following reasons, this Court affirms the Commissioner's decision.

I.

On August 8, 2002, Seidle filed an application with the Social Security Administration (the "SSA") for a period of disability and disability insurance benefits. (R. at 12, 84-86.) She alleged an inability to work as of March 31, 2001. *(Id.)*  The SSA denied Seidle's claim, and subsequently denied her request for reconsideration on October 1, 2003. (R. at 12, 68-70.)

Seidle appealed the denial of her claim and requested a hearing. (R. at 71.)  The hearing was held before an Administrative Law Judge ("ALJ") on February 9, 2005, in Voorhees, New Jersey. (*Id*. at 12.)  ALJ Daniel N. Shellhamer issued a decision on March 8, 2005, holding that Seidle "is not disabled" and was not "under a 'disability,' as defined in the Social Security Act, at any time through the date of this decision." (*Id*. at 12, 26.)

On April 22, 2005, Seidel requested review of the ALJ's decision by the Appeals Council of the SSA, which denied her request for review on September 7, 2005. (R. at 8, 3-5.)  ALJ Shellhamer's decision thus stands as the final decision of the Commissioner.  (*Id*. at 3.)  Seidle filed her appeal with this Court on November 14, 2005.

## II.

Seidle is a sixty-one year old female currently residing in Burlington, New Jersey. (R. at 32.)  At the time of the administrative hearing, Seidle stated that she stood approximately five feet, six and a half inches tall and weighed approximately two hundred sixty (260) pounds.  (*Id.* at 32.) She has a high school education and received fifteen (15) months of vocational training in the areas of shorthand, typing, and WordPerfect from the Cittone Institute. (*Id.* at 38, 117.)  Her past relevant work experience includes telemarketing, reception, filing, and data entering.  (*Id.* at 13, 24.)

Seidle stated that she lives alone and alleged that she has been unable to work since March 31, 2001, the date she was discharged from her job as a telemarketer.  (R. at 17, 32.) Seidle alleged that she has been unable to work because she suffers from back and knee pain, sleeping problems, shaking hands due to anxiety and depression, and urinary incontinence.  (*Id.* at 17, 41, 47.)  She stated that she had been taking Paxil[1] for approximately two years, but that it had not helped her very much with regard to the depression and anxiety.  (*Id.* at 47-48.)

---

[1] Paxil (paroxetine or paroxetine hydrochloride) is an orally administered psychotropic drug used in the treatment of major depressive disorder, social anxiety disorder, obsessive compulsive disorder ("OCD"), panic disorder ("PD"), generalized anxiety disorder ("GAD"), and posttraumatic stress disorder ("PTSD"). GlaxoSmithKline, http://us.gsk.com/products/assets/us_paxil.pdf 1,2 (last visited June 21, 2006).

Additionally, Seidle noted that surgery on her knee has been recommended, but she has not had the surgery because she does not have health insurance. (*Id*. at 49.) Seidle also testified that she has been experiencing problems using her right arm, and it causes her problems in lifting heavy items and wiping herself after a bowel movement. (*Id*. at 52-53.)

In regard to her functioning capabilities and daily living, Seidle testified that she cannot bear any weight on her left foot and left leg because of torn cartilage and arthritis. (R. at 17, 33.) She stated that she has to stand on her toes to in order to stand up and that she requires the use of a quad cane to assist with ambulation. (*Id*.) Seidle stated that she needs a scooter to get around the supermarket because she is unable to walk around the entire store and that she needs assistance in taking groceries to her car. (*Id*. at 43.) She also noted that she is able to clean her apartment, but that it is done in spurts because she is unable to clean on a daily basis. (*Id*. at 51.)

Seidle also indicated that she is not as active as she once was because she cannot walk due to the alleged symptoms. (R. at 45.) For example, Seidle testified that she used to walk a mile per day, was more active around the house, and was active in her parish church, but her activities have been limited due to her physical condition. (*Id*. at 45-46.) Additionally, Seidle admits that she is able to drive, but that she limits herself to driving

only for forty-five minutes to an hour because driving long distances causes pain in her left leg. (*Id*. at 34.) Furthermore, Seidle testified that her physical condition has given her trouble bathing and grooming herself because she is afraid of falling down in the shower due to the pain in her leg and the shaking she experiences. (*Id*. at 49.)

In her SSA Application, Seidle claims that she has problems walking, going up and down stairs, and getting in and out of a car, all of which have limited her ability to work. (R. at 91.) However, the application states that during a typical day Seidle would make her bed, take a shower, cook, clean, and sometimes do laundry, vacuum, wash dishes, and take out the trash. (*Id*. at 18, 113.) Seidle also attested that she had difficulty in lifting objects weighing over thirty pounds, but that she was able to pour milk from a gallon using both hands. (*Id*. at 53-55.)

The record contains extensive medical documentation in regard to Seidle's medical history and the conditions complained of. Records were provided by Seidle's primary treating physicians, Sunset Road Medical Association ("SRMA"), where Dr. Andrew Blank primarily treated Seidle, during the period between July 1997 and May 2004. (R. at 19.) The records indicate that Seidle was treated and given follow-up prescription medication for hypertension, depression/anxiety disorder, stress

incontinence with resultant hemorraghic cystitus, and degenerative joint disease as well as congestion, swollen glands, and other common ailments.  (*Id*. at 168, 170, 194-200, 217-219.)  On March 3, 2000, Seidle had an MRI of her left knee which revealed moderately prominent joint effusion with Baker's Cyst[2], moderate degenerative joint disease and findings that suggested a mild tear of Seidle's medial meniscus. (*Id*. at 179-80.)

Dr. Talone of SRMA referred Seidle to Dr. Arnold Berman, an orthopaedic surgeon, in regard to complaints about her left knee.  (R. at 177.)  Dr. Berman examined Seidle on July 22, 2000, diagnosed her with osteoarthritis and a torn medial meniscus, and administered a Xylocaine injection.  (*Id*. at 177.)  Dr. Berman recommended home exercise, physical therapy, and a prescription of Voltaren and indicated that Seidle might require arthroscopic surgery.  (*Id*. at 177.)

During Seidle's visit to SRMA on May 3, 2002, Seidle indicated that she fell at a store in 2000, pulled muscles in her left side, and was still experiencing pain, even though a prescription of Celebrex did relieve some of the pain.  (R. at 171.)  Seidle was re-examined at SRMA for depression and leg pain

---

[2] Baker's Cyst is a membrane filled sac of fluid that forms behind the knee.  It is formed when synovial fluid (fluid that is produced by the joint lining to lubricate and protect the joints) escapes from the knee joint capsule (also called the synovial sac or synovium) and forms a new sac outside the joint at the back of the knee.  http://www.bigkneepain.com/bakerscyst.html last visited October 25, 2006.

on October 31, 2002, wherein an examination revealed that Seidle had scoliosis and tenderness of her left hip. (*Id*. at 169.)

On October 17, 2002, Seidle went to the emergency department at Rancocas Hospital wherein she was diagnosed with depression/stress reaction. (R. at 153.) Seidle stated that she "feels like everything going wrong", but denied any thoughts or ideas of suicide or homicide, and denied hearing voices. (*Id*. at 154.) She was discharged a few hours later with instruction to follow up with her primary care physician. (*Id*. at 159.)

Dr. Nithyashuba Kohna conducted a consultative orthopaedic evaluation of Seidle at the request of the State unemployment agency. (R. at 162.) In a report dated April 10, 2003, Dr. Kohna diagnosed Seidle with degenerative joint disease with a cyst in the left popliteal fossa by history, a fair prognosis, and indicated that she is moderately limited by being unable to squat, bend, or kneel. (*Id*. at 162-65.) Dr. Kohna also indicated that Seidle would require orthopaedic treatment and a psychiatric evaluation. (*Id*. at 165.) According to Dr. Kohna, the use of the quad cane by Seidle was self-prescribed, that Seidle's muscle strength on the lower left extremity was 4/5, and that there were no trigger points, joint subluxation, contractures, ankylosis, thickening, swelling, or effusion noted. (*Id*. at 163-64.)

After seeing Dr. Kohna, a State agency review physician

conducted a physical residual functional capacity assessment by reviewing the evidence of record and issued an assessment dated April 30, 2003. (R. at 202.) The physician concluded that Seidle could lift and/or carry ten pounds frequently, twenty pounds occasionally, stand and/or walk for at least two hours and sit for about six hours in an eight hour workday. (*Id*. at 203.) After reviewing all of the evidence of record, a second State agency review physician affirmed the assessment. (*Id*. at 209.)

Subsequently, Dr. Donald Moorehead conducted a consultative psychiatric examination of Seidle. (R. at 211-14.) In his report dated September 12, 2003, Dr. Moorehead diagnosed Seidle with an adjustment disorder with mixed anxiety and depressed mood, and found Seidle's prognosis was not positive given her debilitating joint problems. (*Id*. at 214.) Dr. Moorehead acknowledged that Seidle presented with no cognitive deficits or intellectual limitations that would impair her ability to function on the job. (*Id*. at 214.) Dr. Moorehead stated that Seidle possessed at least average intelligence and presented as being capable of performing complex tasks independently, making appropriate decisions, relating adequately with others, and managing her funds. (*Id*. at 214.) He recommended psychiatric intervention and a medical follow-up evaluation to further explore the debilitating effects of her arthritis and radiating back pain. (*Id*. at 214.)

On February 9, 2004, Dr. Lawrence Barr conducted a complex orthopaedic evaluation of Seidle at the request of Dr. Blank of SRMA.  (R. at 215.)  Dr. Barr's impression was a medial meniscal tear, underlying degenerative joint disease, and contusion of the left knee.  (*Id*. at 216.)  He noted that strength in Seidle's left knee was good and there was no pain with internal or external rotation of the knee or hip.  (*Id*.)  He recommended arthroscopic surgery, but noted that Seidle had problems with her insurance at this time.  (*Id*.)

### III.

This Court reviews the decision of the ALJ to determine whether substantial evidence on the record supports the ALJ's decision.  *See* 42 U.S.C. § 405(g); *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999) (citing *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994)).  Any finding of fact made by the ALJ shall be conclusive if it is supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept as adequate."  *Plummer*, 186 F.3d at 427.

### IV.

#### A. The Five-Step Sequential Evaluation

The SSA uses a five-step sequential evaluation process to

9

determine whether an individual is disabled. 20 C.F.R. § 404.1520. In *Plummer v. Apfel*, the Third Circuit described the five-step evaluation:

> In step one, the Commissioner must determine whether the claimant is currently engaging in substantial gainful activity. 20 C.F.R. § 1520(a). If a claimant is found to be engaged in substantial activity, the disability claim will be denied. *Bowen v. Yuckert*, 482 U.S. 137, 140, 107 S.Ct. 2287, 2290-91, 96 L.Ed.2d 119 (1987). In step two, the Commissioner must determine whether the claimant is suffering from a severe impairment. 20 C.F.R. § 404.1520(c). If the claimant fails to show that her impairments are "severe," she is ineligible for disability benefits.
>
> In step three, the Commissioner compares the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful work. 20 C.F.R. § 404.1520(d). If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Step four requires the ALJ to consider whether the claimant retains the residual functional capacity to perform her past relevant work. 20 C.F.R. § 404.1520(d). The claimant bears the burden of demonstrating an inability to return to her past relevant work. *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994). If the claimant is unable to resume her former occupation, the evaluation moves to the final step.
>
> At this stage, the burden of production shifts to the Commissioner, who must demonstrate the claimant is capable of performing other available work in order to deny a claim of disability. 20 C.F.R. § 404.1520(f). The ALJ must show there are other jobs existing in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and residual functional capacity. The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether she is capable of performing work and is not disabled. *See* § 404.1523.

*Plummer*, 186 F.3d at 428. If a determination about a claimant's disability can be made at any step in the sequential evaluation,

10

the analysis is concluded without continuing on to any remaining steps.  20 C.F.R. § 404.1520(a)(4).

### B. The ALJ's Opinion

ALJ Shellhamer held that Seidel was "not under a disability, as defined by the Social Security Act, at any time through the date of this decision, [March 8, 2005]." (R. at 26.)  The ALJ also concluded that Seidle is not entitled to a period of disability and disability insurance benefits under Sections 216(I) and 223 of the Act. (R. at 26.)  This determination was reached after proceeding through the first four steps of the sequential evaluation.  Upon review of the record, this Court concludes that the ALJ's findings are supported by substantial evidence as required by Section 405(g) and *Plummer*.

In the first step, the ALJ found that Seidle had not engaged in substantial gainful activity since March 31, 2001, the alleged onset date of her disability. (R. at 13.)  ALJ Shellhamer determined in the second step that Seidle is severely impaired as a result of the following medical conditions: degenerative joint disease of the left knee and an adjustment disorder.[3] (*Id*.)  To

---

[3] The ALJ noted that Seidle alleged having back pain, urinary incontinence, and difficulty reaching behind her and holding objects with her right hand. (R. at 13.)  The ALJ found these allegations were not severe impairments as defined by the SSA because "the totality of the medical record fails to document that these alleged impairments and functional limitations are medically determinable or would produce more than minimal functional

obtain a designation of severe impairment, Seidle must be significantly limited either physically or mentally in her ability to do basic work activities.  20 C.F.R. § 404.1520 (c).

The ALJ's analysis of the evidence at each of the first two steps was brief.  It is clear, however, from reviewing the record that these findings are supported by substantial evidence. The ALJ's decision, his findings, and the available earnings records indicate that Seidle has not engaged in substantial gainful activity since her alleged onset date of March 31, 2001. (R. at 13, 24, 35, 91.)  The medical reports contained within the record verify that Seidle's physical and mental status is consistent with the findings made in step two.

In the third step, the ALJ found that Seidle "has no impairment which meets or equals the criteria of any of the listed impairments" as set forth in 20 C.F.R. § 404, Subpt. P, App. 1. (R. at 14.)  He noted that "no treating or examining physician has reported findings which either meet or are equivalent in severity to the criteria of any Listed impairment." (*Id*. at 16.)  Guided by the opinions of the State Agency medical consultants and Dr. Kohna, the ALJ stated that Seidle's impairments do not meet or equal a Listing because "no such medical findings are indicated or suggested by the clinical or diagnostic medical evidence of record." (*Id*.)

---

limitations."  (R. at 13-14.) Seidle does not challenge these determinations.

12

Seidle argues that the ALJ improperly considered the evidence regarding Seidle's left leg and erroneously found that her impairment neither met nor equaled Listing 1.02, Major Dysfunction of a Joint(s).  Additionally, Seidle argues that the ALJ failed to properly consider the extent to which Seidle is suffering from depression and anxiety and that her impairment met or equaled Listing 12.04, Affective Disorders.

In his opinion, the ALJ considered the totality of all the medical and non-medical evidence in the record and conducted a comprehensive analysis of the same in determining that Seidle's impairments did not meet or equal the criteria for Listings 1.02 and 12.04.  With regard to Seidle's degenerative joint disease impairment, the ALJ states that his determination is supported by the examination of Dr. Kohna.  (R. at 17.)  Specifically, Dr. Kohna found that Seidle had no trigger points, joint subluxation, contractures, ankylosis, thickening, swelling, or effusion of the lower extremity joints.  (*Id*. at 19.)  Dr. Kohna noted that the muscle strength on Seidle's left lower extremity was only slightly reduced and that Seidle was moderately limited, secondary to the degenerative joint disease.  (*Id*.)  Furthermore, Dr. Kohna's report indicated that Seidle's quad cane was not medically prescribed, even though Seidle testified to needing the cane all the time.  (*Id*. at 22.)

The ALJ's determination that Seidle did not meet or equal

13

the criteria for Listing 12.04 was also supported by substantial evidence, namely the evaluation report of Dr. Moorehead. In his opinion, the ALJ noted that Dr. Moorehead's report indicated that Seidle was currently taking Paxil and her depressive symptoms have been well controlled with the medication. (R. at 20.) Dr. Moorehead detailed that Seidle's attention, concentration, and memory remained intact and that she possessed average intellectual functioning. (*Id*.) He also stated that Seidle presented no cognitive defects or intellectual limitations that would impair her ability to function on a job. (*Id*.) According to the ALJ, this assessment was indicative of a person who could perform jobs in the national economy. (*Id*.)

Additionally, the ALJ considered the non-medical evidence presented and concluded that Seidle's impairments are not as severe as she contends. (R. at 18.) Specifically, the ALJ noted that he had reservations whether Seidle's assertions were fully credible since numerous inconsistencies were present. (*Id*. at 21.) For example, the ALJ noted that Seidle testified that for the past two years she was taking Paxil and that it did not help her symptoms. (*Id*.) However, Seidle informed Dr. Moorehead that her symptoms were well controlled with medication. (*Id*.) Secondly, Seidle testified as having multiple complaints of pain affecting her legs, hands, and back, but in the report by Dr. Kohna, he noted that Seidle was not taking any pain medication.

14

(*Id*. at 22.)  Finally, the ALJ noted that Seidle received unemployment compensation after her alleged disability onset date.  (*Id*. at 21.)  The basis for receiving unemployment benefits is that one posses an ability to work and will return to work as soon as possible.  (R. at 21-22.)  Since Seidle received unemployment compensation after her alleged disability onset date, her assertion that she became unable to work as of March 31, 2001 is suspicious.  (*Id*. at 22.)

In assessing the Seidle's credibility and considering the medical evidence in the record, the ALJ determination that Seidle's impairments did not meet Listing 1.02 or 12.04 was supported by substantial evidence in the record.  Furthermore, "a claimant's subjective statements about pain or other symptoms, without more, cannot be the basis for a disability." *Jaramillo v. Commissioner*, 130 F. App'x 557, 562 (3d Cir. 2005).

Moreover, Seidle has offered no other evidence that suggests that her combined impairments would be medically equivalent to a listed impairment. *Ballardo v. Barnhart*, 68 F. App'x 337, 338 (3d Cir. 2003) ("However, a claimant bears the burden of producing evidence that her impairment is equivalent to a listed impairment, and equivalence to a listed impairment must be determined on the basis of medical findings 'supported by medically acceptable clinical and laboratory techniques.'")(citations omitted).

Next, the ALJ performed an extensive analysis of the medical reports and other relevant documentation contained within the record to determine Osbourne's residual functional capacity.[4] Specifically, the ALJ reviewed medical evaluations and psychological reports generated by Dr. Kohna, Dr. Moorehead, SRMA, Dr. Barr, the State Agency medical consultants, and testimony from Seidle.  (R. at 16-23.)  The reports of these specialists and general medical practitioners addressed Seidle's back pain, leg pain, range of motion, depression and her anxiety. (*Id*. at 16-23.)

Based on his analysis of this evidence the ALJ found that Seidle retains the following residual functional capacity:

> lift and carry five pounds frequently and ten pounds occasionally; can stand and/or walk for two hours in an eight hour workday; is able to sit for six hours in an eight hour workday; can occasionally climb, balance, stoop, kneel, crouch, and crawl; and is restricted to work that involves simple repetitive tasks.

(R. at 17.)  The ALJ determined that this residual functional capacity was sufficient to permit Seidle to perform sedentary[5] work with cited preclusions.  (*Id*. at 23.)

---

[4] "Residual functional capacity" is defined as the most that an individual can do in a work setting despite any physical or mental limitations. 20 C.F.R. § 404.1545(a).

[5] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

In step four, the ALJ concluded that Seidle was able to perform any of her past relevant work. (R. at 25.) The ALJ noted that even though Seidle has an assessed residual functional capacity for sedentary work with cited limitations, that the limitations do not prevent Seidle from performing the duties of a telemarketer or a receptionist. (*Id.* at 24.) The ALJ found that Seidle's testimony as to her limitations, which would preclude her from returning to work, was not supported by the weight of the evidence. (*Id.*) Specifically, the ALJ detailed that Seidle was laid off from her job on the alleged disability onset date and that she testified she was looking for office work. (*Id.*) In the emergency room report dated October 17, 2002, Seidle was cited as saying that she could not find a job. (R. at 24.) According to the ALJ, these statements were indicative that Seidle believed she was capable of performing clerical or secretarial work because she was actively seeking employment. (*Id.*) Therefore, the Court concludes that the ALJ's determination at step four is supported by substantial evidence.

Since the ALJ determined that Seidle retained the residual functional capacity to return to her past relevant work, he decided that Seidle is capable of performing work and is not disabled within the meaning of the SSA. (R. at 25.) The Court has found substantial evidence in the record to support the ALJ's determination. Thus, it is unnecessary to consider the remaining

step in the sequential evaluation process. Accordingly, this Court finds that the ALJ's decision was supported by substantial evidence.

## V.

For the aforementioned reasons, the Court will affirm the final decision of the Commissioner denying Seidle's application for disability benefits. The Court will issue an appropriate order.

Date: October  30th , 2006

                                           s/*Joseph E. Irenas*
                                           JOSEPH E. IRENAS, S.U.S.D.J.